OPINION
{¶ 1} Plaintiff-appellant Protek, Ltd. (hereinafter "Protek") appeals that portion of the December 14, 2004 Judgment Entry of the Stark County Court of Common Pleas declining to award all of Protek's claimed damages and granting defendant-appellee Lake Erie Screw Corporation's (hereinafter "LES") counterclaim for unpaid invoices, after finding defendant-appellee Lake Erie Screw Corporation breached the parties' agreement. LES cross-appeals that portion of the judgment entry finding it materially breached the terms of the parties' agreement, awarding Protek costs due to customer charge-back and expedited shipping, and failing to award LES prejudgment interest.
 STATEMENT OF THE FACTS AND CASE {¶ 2} This case arises out of an agreement between the parties whereby Lake Erie Screw agreed to manufacture and deliver specialty bolts to Protek. Protek alleges LES breached the agreement by failing to meet delivery due dates and by delivering defective product.
 {¶ 3} Both parties are registered QS 9000/ISO 9002 facilities, certifying the implementation of certain processes emphasizing defect prevention and reduction of variation and waste in the supply chain. A QS 9000 supplier is required to establish systems to support 100% on-time shipments to meet customer production and service requirements. Whenever non-conforming product is produced or supplied, QS 9000 certification requires the completion of corrective action reports to address and correct the problem and eliminate the cause of nonconformities.
 {¶ 4} In the Fall of 2001, an outside sales representative for LES called upon Protek's predecessor, Alliance Steel Products, Inc. At the time, LES was aware Protek was experiencing problems with its then supplier. The representative indicated LES was an ISO9002/QS9000 registered manufacturer. Later, Alliance Steel Products, Inc. contacted LES asking them to quote the production of certain specialty bolts for use in Protek's tank pad production. LES responded quoting quantities to be produced, delivery dates and price. The quotes bore the legend "Registered ISO9002/QS9000." Alliance Steel Products did not accept the quote.
 {¶ 5} LES submitted a second quote to Protek on December 17, 2001. The second quote modified the terms of pricing and delivery dates. Protek accepted the second quote and began issuing purchase orders on January 4, 2002. The purchases were ordered for inclusion in tank pad assemblies to be shipped to Goodyear for inclusion in a military project for tanks and fighting vehicles.
 {¶ 6} On March 13, 2002, LES submitted a quotation for a seventh type of bolt. On March 25, 2002, a re-quotation was submitted. A second re-quotation was submitted on June 19, 2002.
 {¶ 7} Protek did not specify or agree to pay only for a defect free product. The terms and conditions of the purchase orders did not contract for "defect free" bolts. The LES quotes contained an express warranty limiting its liability and Protek's remedies.
 {¶ 8} Approximately 90% of the bolts supplied by LES to Protek were to be used by Protek to assemble the tank pads to be used by Goodyear in the production of the tanks for the U.S. military. Approximately 10% of the bolts supplied by LES to Protek were used to service customers other than Goodyear.
 {¶ 9} At the time of the initial requested quotation from LES regarding bolts, Protek faxed copies of the different bolts to LES. Some of the prints were legible, some were "fuzzy", and some were illegible. LES requested Protek provide clearer prints, but the mailed prints were no more legible and the faxed prints did not provide any clarification. Protek indicated to LES it did not have clearer prints. As a result, LES was required to draft its own set of prints. Protek approved prints for six different types of bolts in February 2002, and sent approval of the prints to LES on February 14, 2002. Prior to the approval, however, Protek placed a purchase order for quantities of five of the six types of bolts. The purchase order was dated January 4, 2002, and required delivery of the bolts by March 29, 2002. A second purchase order was placed on January 11, 2002, requiring delivery by April 1, 2002.
 {¶ 10} On February 21, 2002, LES contacted Protek and asked Protek to prioritize the delivery dates for the initial purchase orders, since "currently [LES has] all parts slated for 4/1/02" and in talking with LES' "tooling engineers this is unrealistic" and LES needs "to spread them out somewhat." In response, Protek prioritized the bolt orders.
 {¶ 11} On March 8, 2002, LES proposed a modification to the delivery dates set forth in the initial purchase orders. Protek did not object. The first delivery of bolts did not occur until April 16, 2002.
 {¶ 12} Despite the late delivery, Protek issued additional purchase orders from March 27, 2002, to April 24, 2002. The problems relating to delivery were ongoing throughout the parties' relationship.
 {¶ 13} Some of the bolts LES shipped to Protek were nonconforming. The problem lead to LES implementing a corrective action plan in which LES agreed to "100% containment" visually inspecting all parts shipped to Protek. In the end, LES continued to ship some nonconforming product.
 {¶ 14} Protek filed a complaint in the Stark County Court of Common Pleas on January 14, 2003, alleging breach of contract. LES filed a counterclaim alleging money owed on account. On February 2, 2004, the matter proceeded to a bench trial. The trial court requested the parties file proposed findings of fact and conclusions of law. On December 14, 2004, the trial court, via Judgment Entry, issued its findings of fact and conclusions of law. The trial court concluded LES had not delivered the bolts in a timely manner and had breached a material term of the parties' agreement. The court awarded Protek $155,941.18 for its costs arising from a customer charge-back and expedited shipping. The trial court offset the award to Protek by the amount of LES' counterclaim for unpaid invoices in the amount of $112,670.23. Accordingly, the trial court awarded Protek a net judgment in the amount of $43,270.93.
 {¶ 15} It is from the December 14, 2004, Judgment Entry both parties now appeal.
 {¶ 16} On appeal, Protek assigns as error:
 {¶ 17} "I. THE TRIAL COURT ERRED, AS A MATTER OF LAW AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN FAILING TO AWARD PLAINTIFF ALL OF ITS DAMAGES TO WHICH THE TRIAL COURT HAD RULED PLAINTIFF WAS ENTITLED AS A RESULT OF DEFENDANTS BREACHES.
 {¶ 18} "II. THE TRIAL COURT ERRED, AS A MATTER OF LAW AND AGAINST THE MAINFEST WEIGHT OF THE EVIDNENCE, IN CONCLUDING THAT DEFENDANT-APPELLANT DID NOT WARRANT 100% DEFECT FREE PARTS, THUS FAILING TO AWARD PLAINTIFF INCIDENTAL DAMAGES RESULTING FROM DEFENDANT'S BREACH OF THIS WARRANTY.
 {¶ 19} "III. THE TRIAL COURT ERRED, AS A MATTER OF LAW, IN AWARDING DEFENDANT CONTRACT DAMAGES ON ITS COUNTERCLAIM AFTER THE TRIAL COURT HAD ALREADY RULED THAT DEFENDANT HAD BREACHED, BY VIRTUE OF ITS FAILURES TO PERFORM, THE VERY CONTRACT UPON WHICH THIS COUNTERCLAIM AWARD WAS PREDICATED."
 I {¶ 20} In the first assignment of error, Protek argues the trial court erred in failing to award all of its damages as a result of LES' breach of contract.
 {¶ 21} We review appellant's arguments under a manifest weight of the evidence standard. We are not factfinders; we neither weigh the evidence, nor judge the credibility of witnesses. Our role is to determine whether there is relevant competent and credible evidence upon which the factfinder could base its judgment. Therefore, a judgment supported by some competent, credible evidence going to all the necessary elements of the case will be affirmed. C.E. Morris Co. v. Foley Const.Co. (1978), 54 Ohio St.2d 279.
 {¶ 22} Protek cites its amended complaint alleging damages, and the trial court's finding "LES failed to meet delivery dates" and "delivery was a material term of the parties' contract." Protek asserts, upon the trial court's concluding delivery was a material term of the contract and LES failed to meet the delivery deadlines; Protek was entitled to all of their damages sustained as a result of the breach.
 {¶ 23} Protek notes the trial court properly cited R.C. 1302.88(C) allowing a buyer to recover incidental damages for a seller's breach, and defining "incidental damages" as those "resulting from the seller's breach [including] expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with or effecting cover and any other reasonable expenses incident to the delay or other breach."
 {¶ 24} The trial court awarded Protek back fees assessed by Goodyear, the expense incurred in expedited shipping and transportation. The trial court's December 14, 2004 Judgment Entry finds:
 {¶ 25} "The Court finds that Protek is not entitled to recover or has not carried its burden of proof with respect to any other damages that it sought in this case, such as lost profits relating to another customer (PML), or in-house administrative or labor costs relating to sorting of non-conforming Bolts."
 {¶ 26} Protek argues the trial court should have awarded damages for expedited freight of bolts to Protek's facility, and compensation for the idle time of presses and personnel resulting from LES' breach as found by the trial court.
 {¶ 27} Protek cites the following testimony in support of its argument, relative to Exhibit 11:
 {¶ 28} "Q. The very next column is expedited freight. What is that do you know?
 {¶ 29} "A. That's expedited freight, and I believe that is just expedited freight of that bolt to our facility.
 {¶ 30} "Q. Can you explain for us a little more clearly what expedited freight is?
 {¶ 31} "A. Expedited freight is client carrier that, you know, as opposed to just normal LTL carrier, somebody that does that for a living that you are going to call and say it is the usual time to pick up, say, two in the morning and we need that driven straight through to our facility. We can't afford to wait for normal lead time.
 {¶ 32} "Q. There is no number under expedited freight for that first part number, so you didn't incur any expedited freight cost for that particular bolt; is that correct?
 {¶ 33} "A. That particular bolt shipped to the facility is how it is done.
 {¶ 34} Tr. at 329-330.
 {¶ 35} Upon review, we find the testimony cited by Protek does not provide supporting an award of expedited freight damages for shipping to Protek's facility.
 {¶ 36} Protek also asserts the delivery failures by LES created a bottleneck effect causing valuable presses and operators to sit idle. Appellant does not support the argument with citations to the record. Accordingly, we find the trial court's award of damages was supported by competent, credible evidence, and the court did not err in failing to award damages due to idle presses or operators.
 {¶ 37} Further, Protek claims damage to its business relations with other customers. Protek argues it was required to dedicate certain presses strictly to the production of tank pads, and remove the presses from the production for other customers, particularly PML. Protek asserts, as a result of its experiences with LES, Protek's business relationship with PML suffered due to outsourcing of jobs and then in an eventual loss of work. Protek maintains it offered detailed and undisputed evidence quantifying its business relationship with PML and the economic impact of the lost business.
 {¶ 38} The following exchange occurred at trial:
 {¶ 39} "Q. Okay. And the PML business documents that you referred to earlier, do you have those in front of you, sir?
 {¶ 40} "* * *
 {¶ 41} "Q. So if this one here says Alliance Steel Products, it is 2002, and if it were really a contract with Protek, shouldn't it say Protek on it?
 {¶ 42} "A. I just pulled PML, didn't correspond over the Internet or anything. These are just examples of that that we still had in the facility. They were boxed up, we don't keep them forever, had to go back to this time frame to dig out. That is just to show what the volumes were over the period of time. I didn't mean to correlate that that was a contract with Protek. Later they started dealing with Protek.
 {¶ 43} "Q. In your deposition, sir, you said, correct me if I am wrong, that PML had cancelled twelve contracts?
 {¶ 44} "A. I said roughly twelve. I didn't have anything in front of me.
 {¶ 45} "Q. Okay. I count thirteen pages here, sir.
 {¶ 46} "A. Yes.
 {¶ 47} "Q. Are you aware Mr. Dinger thought it was twenty?
 {¶ 48} "A. There may have been. Their service parts, I don't count service parts as a current production part; but there probably are twenty, maybe not quite twenty, but there are probably that many part numbers at our facility at that time. They wouldn't be reflected in the purchase orders. They only give service parts when they need them.
 {¶ 49} "Q. We will stick to the ones that have been provided. February 12, 2002, and where on here does it show that purchase order was cancelled?
 {¶ 50} "A. It doesn't.
 {¶ 51} "Q. Do you have any documents, any writings, anything of that nature that would show that PML cancelled this particular purchase order?
 {¶ 52} "A. All the orders were cancelled at our facility at a face-to-face meeting with Mr. Dinger and myself.
 {¶ 53} "Q. I don't want an out of court statement, sir. I am just asking you, do you have any documents that show that of any kind?
 {¶ 54} "A. No, we don't have any with Lake Erie either.
 {¶ 55} "Q. Well, Lake Erie delivered all their bolts?
 {¶ 56} "A. No, in this industry you just stop making purchase orders basically.
 {¶ 57} "Q. Even if they are in effect?
 {¶ 58} "A. The relationship ended at this point in the fall.
 {¶ 59} "Q. The fall of 2002?
 {¶ 60} "A. Maybe later than that. The business was starting, the process of moving the business in the fall. We ran some parts for them while they were sourcing them with other companies.
 {¶ 61} "Q. Now, sir, how would anyone know form the part numbers listed that these are the RMO bolts that are at issue in this case?
 {¶ 62} "A. I have stated several times that there are no bolts that Lake Erie made for Protek that were PML jobs.
 {¶ 63} "* * *
 {¶ 64} "A. No, this is not intended to show cancellation. This was intended to show volumes and purchase prices.
 {¶ 65} "Q. Sir, but in order to show lost profits you have to show lost business. This is just a purchase order. That shows existing business. I'm asking you for evidence that it is cancelled, and you are telling me you don't have any other than the hearsay that you referred to earlier; correct?
 {¶ 66} "Mr. Rubin: Objection. His testimony is not hearsay.
 {¶ 67} "Mr. Porter: No, but the conversation —
 {¶ 68} "The Court: Right, I understand the characterization which the Court will disregard the characterization. You may continue.
 {¶ 69} "* * *
 {¶ 70} "Q. So you are basing it, seems to me that this lost profits calculation is based in large part on purchase orders executed prior to the relationship with Lake Erie; isn't that right, sir?
 {¶ 71} "A. Well, there is a lot of them in here that are after the quote. This was just to show a history of the volume and that they just didn't appear out of the blue sky, that this relationship was ongoing. You know, if you go to the first ones, they are at the time when we first started receiving bolts from Lake Erie. That's why I thought it was appropriate to show previous orders to show that this was a continuation of business between the two companies.
 {¶ 72} "Q. None of which in any way show they were cancelled, right?
 {¶ 73} "A. No, they don't.
 {¶ 74} "Q. Labor costs, sir, you reference labor costs with regard to lost profits; right?
 {¶ 75} "A. Yes.
 {¶ 76} "Q. And you referenced people having to work here instead of there in order to come up with that number in lost parts?
 {¶ 77} "A. If I said so.
 {¶ 78} "Q. Instead of having people run the machine for RMO 130 for tank pad, that person wound up going somewhere else and doing something else; is that right, sir?
 {¶ 79} "A. That's not, I don't know what you are referring to and what I said. I guess some of the costs that aren't in there is down time from pulling someone off the job, changing a tool and moving them to another job. It is not like the equipment is sitting there waiting for the other person. Also, we are waiting for bolts to come in and so we commit the equipment. Bolts don't come, and we have bodies standing.
 {¶ 80} "Q. Couldn't they do something else?
 {¶ 81} "A. Not if there is not a tool waiting for them and a press to run, no, there is not.
 {¶ 82} "Q. Well, isn't it common in the manufacturing world that workers idled by work stoppage or say machine difficulty, machine problem, will clean floors, clean the place, check stock, check delivery, conduct training, things of that nature?
 {¶ 83} "A. Quite frankly we make our money when presses go up and down. We don't make any money by pushing a broom. If there is eight guys standing, the place is kept in normal order so we don't have enough cleaning for bodies to do. No, that isn't the standard. That's running an inefficient plant as far as I am concerned.
 {¶ 84} "Q. You pay these folks by the hour?
 {¶ 85} "A. Yes we do.
 {¶ 86} "Q. Can you give them half day off, four hours off?
 {¶ 87} "A. I guess if I understand your question, I give people a day off anytime they want. I don't understand where you are coming from.
 {¶ 88} "Q. Is there a contractual agreement between Protek and its employees that if they come to work and there is not work for them that particular day that they are paid four hours?
 {¶ 89} "A. Yes, that's in there.
 {¶ 90} "Q. Do you have any documents that show the work performed — excuse me — the money spent by Protek per hour per employee, sir?
 {¶ 91} "A. Payroll records.
 {¶ 92} "Q. Where are they, sir? Can you point them out, please, in the Plaintiff's exhibit notebook?
 {¶ 93} "A. I think there is an example of operators in Plaintiff's Exhibit 14.
 {¶ 94} "Q. You will have to bear with me while in find 14, sir. So there are six employees listed and week ending 4-18 is listed at the top left. Is that the correct page, sir?
 {¶ 95} "A. Yes.
 {¶ 96} "Q. And you are aware that Lake Erie's bolts, first bolts arrived April 16; right?
 {¶ 97} "A. Yes, yeah.
 {¶ 98} "Q. Okay. Now, how would I know from this document, sir, that these folks were standing around doing nothing and getting paid by Protek?
 {¶ 99} "A. I didn't allude that this document pointed to anybody standing around doing nothing.
 {¶ 100} "Q. I will withdraw the characterization. Sir, how does this document support your claim for lost profits?
 {¶ 101} "A. This I believe was intended to show, dealing with the first order when we found the problems with the bolts, we freed three people on the job; and this is basically pulling job cards for work that we did on those particular dates over and above what we normally would have done, and this is basically what that is intended to show.
 {¶ 102} "* * *
 {¶ 103} "A. I never said they were idle. I said it has happened. In this case this is when we were running bolts that we were having problems with that we threw extra body on to ensure that we did not have any product leaving our plant.
 {¶ 104} Tr. at 366-381.
 {¶ 105} Upon review, the trial court's decision not to award Protek's damages claimed for lost profits and labor costs is not against the manifest weight of the evidence. Protek's evidence to support its claim for these damages was confusing and speculative.
 {¶ 106} Protek's first assignment of error is overruled.
 II {¶ 107} In the second assignment of error, Protek argues the trial court erred in concluding LES did not warrant 100% defect free parts. Protek cites the QS/ISO 9000 certifications held by LES, promoted by its sales representative and printed on all quotes submitted to Protek. The certifications indicate the company has developed and implemented programs designed to promote defect-free parts production and a corrective action system to prevent future deficiencies. Protek asserts the certifications constitute a warranty peculiar to the various industries, including a warranty for 100% on time delivery and 100% defect free shipment of parts. Protek maintains the warranties were found in LES' QS Manuals and evidenced by the responses to the quality problems, including the corrective action plan.
 {¶ 108} Protek cites the 100% containment plan implemented by LES, including a certification of "100% sort" on each shipment. Protek asserts the last shipment from LES contained bolts with missing threads, split heads, missing plating and non-conforming shoulders, which shipment was labeled 100% sort. Accordingly, Protek maintains the trial court erred in not finding Protek sustained $244,908 in incidental damages incurred in connection with the defective product.
 {¶ 109} The trial court found 1,098 of the 2.1 million LES bolts delivered to Protek were defective. The trial court concluded a .05% defect rate was acceptable under prevailing fastener industry safety standards.
 {¶ 110} An employee of LES, Stanley Rhodes, testified at trial as to the 100% containment policy:
 {¶ 111} "Q. Well what does QS specify, Mr. Rhodes?
 {¶ 112} "A. QS is not a certification of product. It is a certification of your processes.
 {¶ 113} "Q. Doesn't it certify that your processes are going to strive to produce defective free product?
 {¶ 114} "A. Yes, that does; makes no claim toward actual defective free product.
 {¶ 115} "Q. Okay. What about after you have been placed on containment, what happens to your responsibility at Lake Erie once you have been placed on containment by Protek according to QS?
 {¶ 116} "A. We had an agreed upon containment plan between Protek and Lake Erie Products.
 {¶ 117} "Q. A containment plan required 100 percent defective free product, didn't it?
 {¶ 118} "A. It — our containment plan was that we would 100 percent sort the product.
 {¶ 119} "Q. Okay. What was the reason for sorting the product, Mr. Rhodes?
 {¶ 120} "A. Because there were defects found, Protek found defects.
 {¶ 121} "Q. And after you were placed on containment and required to sort your product 100 percent before it was shipped, doesn't that mean that whenever somebody saw a defective bolt they had to pull it out and put it away because it wasn't going to be included in any shipment to Protek; isn't that what it means?
 {¶ 122} "A. That's what that would mean.
 {¶ 123} "Q. Okay. So after Lake Erie did that, went through that 100 percent sorting process and separated all the bad bolts from the good bolts, it then certified on each shipment to Protek that all of the bolts that were being shipped were defective free. Isn't that true?
 {¶ 124} "* * *
 {¶ 125} "A. Basically that's a certification that we have went through our agreed upon containment action which was 100 percent sorted.
 {¶ 126} "Q. So you are saying it was not a certification that the bolts you were shipping to Protek after going through the hundred percent containment process were defective free?
 {¶ 127} "A. Even doing a manual sort, you can not guarantee, you can not guarantee defective free product going through a manual sorting process."
 {¶ 128} Tr. at 503-506.
 {¶ 129} Upon reviews Protek's argument attempts to insert into the contract a term for which it neither negotiated, nor paid. Evidence produced at trial indicates an agreement expressly requiring defect free parts would have increased the cost by an additional $15 to $25 per thousand bolts produced.
 {¶ 130} We find the trial court could properly conclude based upon the evidence the 100% visual inspection of each bolt shipment, accomplished at the customer's request and performed in accordance with the supplier's quality procedures manual, does not guarantee 100% defect free parts. Rather, the QS 9000 certification indicated such procedures were in place. Accordingly, Protek's second assignment of error is overruled.
 III {¶ 131} In the third assignment of error, Protek maintains the trial court erred in awarding LES contract damages on its counterclaim after the trial court concluded LES breached the contract.
 {¶ 132} Protek asserts the delivery terms of the contract were critical, and the evidence at trial established LES consistently delivered late quantities.
 {¶ 133} The trial court's December 14, 2004 Judgment Entry finds:
 {¶ 134} "50. The court finds that some of the delivery due dates required by Protek were unreasonable. For instance, the March 29, 2002, delivery date contained in the initial purchase order, dated January 4, 2002, for five (5) types of bolts was unreasonable because Protek had not even approved the drawings for the tooling for the bolts at the time the order was placed and did not do so until February 14, 2002. LES's purchase order required a 12-14 week lead time on initial orders. Inasmuch as the drawings for the bolts were not approved by Protek until February 14, 2002, the March 29, 2002, due date did not provide LES with the requisite 12-14 week lead time set forth in the quotation. These dates, however, were eventually modified at the request of LES.
 {¶ 135} "51. The failure to meet delivery dates was due to problems LES was having with its tooling for the bolts. (Tr., at 307-308.)
 {¶ 136} "52. LES kept assuring Protek that the problems with the tooling would be resolved. (Tr., at 311.) Protek continued to reorder bolts from LES due to LES's assurances that the bolts would be delivered by delivery dates. (Tr., at 190, 254, 6076-08.) Additionally, Protek made a business decision not to change suppliers because that would delay delivery of bolts even more due to the lead time needed for a new supplier to obtain tooling. (Tr., at 309, 355.)"
 {¶ 137} Upon review of the evidence and the trial court's findings of fact and conclusions of law, we find the trial court did not err in awarding LES contract damages on its counterclaim. The trial court properly concluded some of the delivery dates requested by Protek were unreasonable. The non-conformance rate of the product was acceptable under industry standards, and Protek contracted for 2.1 million bolts, which LES delivered. Protek has not paid $112,670.23 of the invoices sent by LES, but was paid more than $2 million by Goodyear for the tank pads Protek supplied to Goodyear. Accordingly, the trial court properly offset Protek's award by the amount owed on the invoices.
 {¶ 138} Protek's third assignment of error is overruled.
 {¶ 139} On cross-appeal, LES assigns as error:
 {¶ 140} "I. THE TRIAL COURT ERRED IN FINDING LAKE ERIE BREACHED THE CONTRACT.
 {¶ 141} "II. THE TRIAL COURT ERRED IN FINDING THAT LAKE ERIE'S WARRANTY FAILED OF ITS ESSENTIAL PURPOSE.
 {¶ 142} "III. THE TRIAL COURT'S AWARD OF $155,941.18 TO PROTEK WAS NOT SUPPORTED BY COMPETENT, CREDIBLE EVIDENCE.
 {¶ 143} "IV. THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO AWARD LAKE ERIE STATUOTRY PRE-JUDGMENT INTEREST ON ITS COUNTERCLAIM."
 {¶ 144} Again, we review cross-appellant's arguments under a manifest weight of the evidence standard.
 CROSS-APPEAL I {¶ 145} In the first assignment of error, LES asserts Protek, not LES breached the parties' agreement. The evidence adduced at trial indicates Protek contracted for and received 2.1 million bolts. Therefore, Protek breached the agreement by withholding full payment from LES
 {¶ 146} LES maintains Protek waived the delivery dates by making a business decision to continue its relationship with LES after the initial delivery dates passed. LES notes Protek issued twelve additional purchase orders after having knowledge LES was having difficulty acquiring the necessary tooling. Therefore, LES asserts the trial court erred in finding LES breached the agreement.
 {¶ 147} Upon review of the evidence, the trial court properly concluded LES continually failed to meet delivery deadlines throughout performance of the parties' agreement. At the time the agreement was made, LES was aware of problems Protek was having with its then supplier, and knew time was of the essence in the agreement. The evidence at trial indicated the failure to meet some delivery dates was due to problems LES was having with its tooling for the bolts. LES continually assured Protek the problems with tooling would be resolved, and Protek's business decision not to change suppliers was due to the lead time needed for a new supplier to obtain tooling. Furthermore, testimony at trial established there were times when LES represented to Protek bolts were being manufactured when such was not the case.
 {¶ 148} The trial court properly concluded delivery was a material term of the parties' agreement. As a result of LES' failure to meet all delivery deadlines, Protek sustained damages in the form of expedited and excessive freight charges and customer charge-backs.
 {¶ 149} Based upon the above, the trial court did not err in finding LES breached the parties' agreement and awarding Protek damages incurred as a result thereof. LES' first assignment of error on cross-appeal is overruled.
 CROSS-APPEAL II {¶ 150} In the second assignment of error, LES argues the trial court erred in finding LES' warranty failed of its essential purpose.
 {¶ 151} LES cites the express limited warranty included in its quotes to Protek. The warranty provided the bolts would be manufactured in substantial compliance with Protek's specifications, and limited Protek's remedies to repair or replacement of the goods sold.
 {¶ 152} LES cites the Ohio Supreme decision in Chemtrol Adhesives,Inc. v. American Manuf. Mut. Ins. Co. (1989), 42 Ohio St.3d 40, arguing the limited remedy should only fail where the seller is unable or unwilling to make repairs within a reasonable period of time. Therefore, the warranty has fulfilled its essential purpose when the buyer receives the benefit of the bargain.
 {¶ 153} The trial court's Judgment Entry stated:
 {¶ 154} "73. R.C. § 1302.93 (A)(1) provides that the contracting parties in a commercial transaction may "limit or alter the measure of damages recoverable" by "limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of the nonconforming goods or parts." However, where such an exclusive/limited remedy fails of its "essential purpose," the buyer is entitled to remedies as provided in the Revised Code. R.C. § 1302.93 (B).
 {¶ 155} "74. A limited remedies clause fails of its essential purpose when "an apparently fair and reasonable clause, because of circumstances, fails in its purpose or operates to deprive either party of the substantial value of the bargain." 81 Ohio Jur.3d. Sales and Exchanges of Personal Property § 180.
 {¶ 156} "75. When a limited remedies clause fails of its essential purpose, so too does the seller's disclaimer of liability for consequential damages. 81 Ohio Jur.3d Sales and Exchanges of Personal Property § 181, Goddard v. General Motors Corporation (1979).60 Ohio St.2d 41, D.O.V. Graphics, Inc. v. Eastman Kodak Co. (1976) 46 Ohio Mis. 37.
 {¶ 157} "76. The Court in Goodyear, supra, citing Clark v.International Harvester (1978), 99 Idaho 326, 581 P.2d 784, held that:
 {¶ 158} "The purpose of the exclusive repair or replacement remedy is to ensure that the purchaser receives a product which conforms to the express warranty, i.e., that the product is free from defects, and if the product proves defective within the warranty period the seller is obligated to cure the defect within a reasonable time. * * * [Citations omitted.] If, however, the seller is subsequently unable or unwilling to repair or replace a defective part within a reasonable time, the buyer is left with a defective product — not conforming to the warranty — and the limited remedy has not achieved its purpose."
 {¶ 159} "77. R.C. § 1301.06 states that the remedies provided in R.C. Chapter 1302 "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed, but neither consequential or special nor penal damages may be had except as specifically provided in those chapters or by other rule of law."
 {¶ 160} "78. R.C. § 1302.88(C) allows a buyer to recover incidental damages for a seller's breach.
 {¶ 161} "79. "Incidental damages" are those resulting from the seller's breach [including] expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
 {¶ 162} "80. The "essential purpose" of the warranty in LES' quotes was to provide LES with the opportunity to cure defective products. Additionally, the consequential damages exclusion pertained solely to any consequential damages arising from any defects in the screws provided by LES. Moreover, the warranty did not exclude the recovery for incidental damages.
 {¶ 163} "81. With respect to some of the non-conforming or defective product, the warranty in LES's quotations did not fail of its essential purpose as LES and Protek were able to "cure" or "repair" the defects in the bolts through sorting.
 {¶ 164} "82. With respect to other non-conforming bolts, Protek chose to reject the bolts and they were then replaced by LES.
 {¶ 165} "83. As to non-conforming bolts, the Court finds that the limited remedies clause did not fail of its essential purpose.
 {¶ 166} "84. To the extent the limited remedies clause in LES's quotation may have been intended to cover late delivery of product, however, the Court finds that it fails of its essential purpose and that Protek is entitled to recover damages from LES caused by the late delivery.
 {¶ 167} Upon review, the trial court properly concluded the limited remedies clause failed of its essential purpose in covering the late delivery of product; therefore, Protek is entitled to recover damages from LES caused by late delivery. We agree with the trial court LES could not have cured or repaired the late delivery of product; therefore, the limited warranty clause necessarily failed of its essential purpose, and Protek was entitled to incidental damages arising out of LES' breach.
 {¶ 168} The second assignment of error on cross-appeal is overruled.
 CROSS-APPEAL III {¶ 169} In the third assignment of error on cross-appeal, LES maintains the trial court's award of $155,941.18 to Protek was not supported by competent, credible evidence. Specifically, LES asserts Protek's evidence concerning charge backs and expedited freight costs was insufficient to support the award.
 {¶ 170} Upon review of the record, we find the trial court had before it competent credible evidence to render its judgment. The trial court properly cited testimony in the record and trial exhibits 11 and 13 in calculating Protek's damages.
 {¶ 171} LES' third assignment of error is overruled.
 CROSS-APPEAL IV {¶ 172} In the final assignment of error on cross-appeal, LES asserts the trial court erred as a matter of law in failing to award LES statutory pre-judgment interest on its counterclaim.
 {¶ 173} As discussed in our disposition of appellant/cross-appellee Protek's first assignment of error, the trial court specifically found "LES failed to meet delivery dates" and "delivery was a material term of the parties' contract." The trial court awarded Protek $155,941.18 in damages representing back fees and expense incurred in expedited shipping and transportation resulting from LES' material breach. The trial court offset the award to Protek by the amount of LES' counterclaim for unpaid invoices in the amount of $112,670.23, resulting in a net judgment in the amount of $43,270.93 in favor of Protek.
 {¶ 174} Based upon the trial court's finding LES materially breached the parties' agreement and a net judgment in favor of Protek, we find LES is not entitled to prejudgment interest under R.C. 1343.03.
 {¶ 175} LES' fourth assignment of error on cross-appeal is overruled.
 {¶ 176} The December 14, 2004 Judgment Entry of the Stark County Court of Common Pleas is affirmed.
Hoffman, J. Boggins, P.J. and Edwards, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the December 14, 2004 Judgment Entry of the Stark County Court of Common Pleas is affirmed. Costs to be divided.